44 P.3d 1085

**John DOE, Petitioner–Appellee,**

v.

**Jane DOE, Respondent–Appellant.**

No. 23584.

Supreme Court of Hawai'i.

April 18, 2002.

Paul A. Lynch and Steven J. Kim, Honolulu, (Lynch Ichida Thompson & Kim), for respondent-appellant.

Robert M. Harris, Honolulu, and Darren L. Wu, for petitioner-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by ACOBA, J.

We hold that, in a child custody proceeding, where the best interests of the child are paramount, the family court of the first circuit (the court)[1] abused its discretion, under the circumstances, when it denied the Hawai'i Family Court Rule (HFCR) Rule 59(a)(2000) motion of Respondent–Appellant Jane Doe (Mother)[2] requesting that additional testimony be taken subsequent to the termination of a custody proceeding limited to three hours.

Mother appeals from the following orders of the court: (1) the May 22, 2000 findings of fact, conclusions of law, and order and (2) the June 24, 2000 order denying her motion for new trial, reconsideration, and/or relief from the default judgment. The court orders resulted in confirming sole legal and physical custody of Child in Petitioner–Appellee John Doe (Father) with visitation rights to Mother. For the reasons stated herein, we affirm the denial of her motion to set aside the prior default judgment, but vacate the aforesaid findings of fact, conclusions of law, and order and the order denying her motion for new trial as they pertain to Mother's alternative motion for award of custody to her, and remand for further proceedings.

I.

According to Mother, she and Father became romantically involved in November 1994. In August 1995, Mother became pregnant, and Child was born to Mother and Father on May 15, 1996. The three lived together in Father's home for two-and-a-half years in Honolulu. Father worked in the construction industry, and Mother owned a bridal shop. In October 1998, Mother moved to reside with her friend, Kim Barnes, taking Child with her. On December 25, 1998, Mother left the state, saying she was taking Child with her on a two-week visit with her brother in Texas; however, they did not return.

On January 6, 1999, as a result of Child's disappearance, Father filed a petition to establish his paternity of Child and asked for "joint care, custody[,] and control of the subject child" by Father and Mother. The petition and a summons for Mother were delivered to Mother's bridal shop by a process server on January 26, 1999. The documents were received by an employee of the bridal shop. Mother did not respond. Mother testified that she did not learn of the paternity action until January or February of 1999, when she contacted the shop. She explained that she believed the paternity action only involved a blood test.

Mother first contacted Father in "January 1999" from her father's home in Montana. Father made an unsuccessful attempt to serve Mother in Montana using a process server there. On February 15, 1999, Mother went to Bali, remaining there until approximately February 15, 2000, when she went to Canada.

On March 3, 1999, Father filed a motion for entry of default, or, in the alternative, for an order for service by publication of the paternity petition and for sole legal custody of Child, with reasonable visitation rights to Mother. The court granted publication of the notice, and the order granting publication was filed on March 5, 1999.

The notice was published in the Honolulu Advertiser and stated, *inter alia,* that (1) Father "should be adjudged the natural father of [Child]," (2) he "should be awarded sole legal and physical custody of [Child],

---

1. The Honorable Darryl Y.C. Choy presided over the default matter on May 20, 1999 and the Honorable Dan T. Kochi presided over the hearing on May 1, 2000 and the subsequent reconsideration motion.

2. For purposes of preserving confidentiality, Respondent–Appellant Mother is referred to as "Jane Doe" or "Mother," Petitioner–Appellee Father is referred to as "John Doe" or "Father," and the subject child is referred to as "Child."

subject to [Mother]'s rights of reasonable visitation," and (3) a hearing would be conducted on May 20, 1999.

Mother did not respond or appear at the hearing on May 20, 1999, and the court entered default judgment against her. Father did not hear from Mother until she called him collect on May 23, 1999 from Perth, Australia. In this phone call, Father said he would "give [Mother] anything [she] want[ed] if [she would] just bring [Child] back because ... [he had] documents for custody." According to Father, Mother "said[,] '[N]o, I'm not coming back and don't try to find me.'" Father did not inform Mother that he had been granted sole physical and legal custody of Child. Judgment was entered on June 23, 1999, adjudging Father the father of Child, granting Father "sole legal and sole physical care, custody[,] and control of the subject child," and denying Mother visitation until further order of the court.

Father subsequently applied for services with, *inter alia*, the Missing Children's Society of Canada, and, by February 2000, it had located Mother and Child in Calgary. In a Hague Convention[3] proceeding in Canada, the Canadian court (1) found that Mother had wrongfully retained Child within the meaning of the Hague Convention, (2) ordered Mother and Child back to Hawai'i, (3) required that Father consent to a restraining order in favor of Mother, and (4) ordered joint physical custody with supervised visitation rights for Father until determination by a court in Hawai'i about Mother's claims of abuse.

On March 6, 2000, Mother filed an ex parte motion for approval of the Canadian court's orders. The ex parte motion was granted and the restraining order and the interim custody order were also entered on that day. Mother and Child then returned to Hawai'i.

## II.

On March 10, 2000, Father filed a "Motion to Set Aside Interim Custody and Access Order in Order ... to Prevent [Mother] from Wrongfully Fleeing to the Mainland with the Child and to Set Aside Restraining Order Filed March 6, 2000[.]"

On March 13, 2000, Mother filed a motion to set aside the default judgment or, in the alternative, to award custody of Child and child support to her, and for attorney's fees and costs.

The hearing on the two motions was originally set for April 12, 2000. However, on April 4, Father filed a motion to allow testimony by telephone at the hearing scheduled for April 12, 2000. On April 5, Mother's counsel filed a motion to withdraw as counsel and a motion to continue the evidentiary hearing. On April 10, 2000, the court granted the latter three motions and set the new hearing regarding the two former motions for May 1, 2000. The court also ordered that "[t]rial is to be ½ day."

Father filed his amended witness list as follows:

1. [Father]
2. [Mother]
3. E.A. (Ted) Davis
4. Jesus Navarro
5. Mohala Nunies
6. Kalani [sic] Tuifua
7. Any and all witnesses named and/or called by Defendant, as necessary and appropriate

---

**3.** Under the Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 ("the Hague Convention"), the court of a Contracting State is to effectuate the return of a child abducted by the non-custodial parent if the child is wrongfully abducted or retained in a country that is not the child's habitual residence. *See* Hague Convention, art. 1. The Hague Convention only empowers courts in the Contracting States to determine rights under the Convention and not the merits of any underlying child custody

claims. *See id.*, arts. 16, 17, 19. We take judicial notice of the Hague Convention, *see* Hawai'i Rules of Evidence (HRE) Rule 202(c) (1993); *State v. Marley*, 54 Haw. 450, 465, 509 P.2d 1095, 1105 (1973) ("All courts, including state courts, take judicial notice of American treaties[.]" (Citation omitted.)), and the fact that Canada is a Contracting State, *see also Duquette v. Tahan*, 252 N.J.Super. 554, 600 A.2d 472, 473 n. 1 (1991) (noting that Canada ratified the Hague Convention in 1988).

8. Any and all rebuttal and/or impeachment witnesses, as necessary and appropriate

On April 28, 2000, Mother submitted a six-witness list as follows:

1. [Mother]
2. Kim Barnes
3. Kathy Kerhoulas
4. Mele Poleo
5. Kaulana Watanabe
6. Kaloni Tuifua
7. Any and all witnesses named and/or called by the Defendant, as necessary and appropriate
8. Any and all rebuttal and/or impeachment witnesses, as necessary and appropriate.

On May 1, 2000, the evidentiary hearing on the pending motions was held before the court. The hearing began at 9:04 a.m. and ended at 12:17 p.m. The court heard the testimony of Father and his witnesses, Edward Davis, Mohala Nunies, Jesus Navarro, and Kaloni Tuifua, and of Mother.

Father testified that he was concerned that Mother would take Child and leave the State of Hawai'i. Testifying for Father, Davis, an investigator for the Missing Children's Society of Canada, characterized the relationship between Father and Child as "a good interaction," and "their visits were very father-daughter oriented, very good visits." He said that when Child saw Father, she went right to him.

Father's witness, Nunies, whose husband worked with Father, described Father's relationship with Child as "[h]appily unseparable. . . . [They are v]ery happy, close, and [Child] seemed like a daddy's little girl." She stated that Father seemed to be a "natural" and a "[v]ery good father" because "he knows how to provide well for his daughter, he knows how to keep her busy and going,

playful." Tuifua, whose name appeared on both Father's and Mother's witness lists, but was called by Father, testified that Child was "always a happy girl" and was happy when she was with Father. On cross-examination, Tuifua indicated that, before Mother had left with Child, Mother and Child had spent many holidays with the Tuifua family, which Father had not attended, and that, accordingly, she had not seen Father, Mother, and Child together prior to Christmas 1998.

In contrast to the foregoing testimony, Mother testified that, after one alleged abusive sexual encounter to which Mother did not consent and "cried" throughout, Father "rolled over and punched [a] nightstand" and made "a pretty big hole" in it. Mother described another alleged incident between herself and Father in which they "got into a physical contact and he had his hands around [her] neck and [she] had hair pulled out of [her] head." Mother also related that Father abused the family dog.[4]

Mother recounted that Father used vulgar language in the presence of both her and Child. She explained that "[m]ost of the statements always involved the word 'fuck.'"

Father testified that Mother's allegations of physical and mental abuse were "false and total lies" and that he did "nothing to her at all." Father related that he believed Mother made these claims "to try to get [Child] away from [him]." On cross-examination, Father denied using "vulgarities in front of [Child]," swearing at Mother, throwing things at Mother, kicking objects, and breaking furniture.

Mother's counsel indicated that she wanted to call Barnes as her next witness, but asked, "Do we have time to go on? Oh, it's already after 12." The court responded, "Yes, and I think your time is up also," and concluded the proceedings. Both parties submitted written closing arguments.

---

4. Mother testified as follows:

I seen him swear at the dog many times, you fucking dog, he would hit it with the leash. When he, you know, the dog would chew something, and it didn't matter if it was our shoes or he used to want to swim in the (indiscernible) plant that we had by the house, he tied the plants and the shoes to his head with duct tape and said

I'm going to teach you fucking dog never to do that again.
. . . He would like stick pencils in its ears and its nose and he said this is the way you teach a dog so it wouldn't bite your child because your child will do it.
. . . One time that I know of, [he] didn't give it any food and left it out in the rain all night[.]

On May 22, 2000, written findings of fact and conclusions of law were filed by the court. As to the evidence of abuse, the court found as follows:

25. [Mother] testified Father regularly used vulgarity and was abusive towards her. She mentioned two occasions in which Father allegedly physically abused her. She never called the police and there are no police reports of abuse filed against Father. Father denied any abuse of [Mother]. *The evidence presented is inconclusive.* Defendant claims that after one of the alleged incidents Father punched and damaged the drawer of the nightstand.... However, the damage shown in the photograph is not characteristic of one that was made by a punch.

(Emphasis added.)

The court granted Father's March 10, 2000 motion and vacated (1) the consent interim joint legal and joint physical custody order filed on March 6, 2000 and (2) the restraining order filed on March 6, 2000. The court denied Mother's March 13, 2000 motion to set aside the default judgment, thus confirming sole legal and physical custody of Child to Father; however, the default judgment was modified to allow visitation rights to Mother.

### III.

On May 26, 2000, new counsel appeared for Mother. On June 1, 2000, Mother's new counsel submitted a motion for a new trial, for reconsideration, and/or for relief from the default judgment filed on June 23, 1999 and from the findings of fact, conclusions of law, and order filed on May 22, 2000, pursuant to HFCR Rules 59 and 60 (2000). The motion was stamped "RECEIVED Jun 01, 2000, 21st DIVISION." The motion was stamped "FILED" the following day, June 2, 2000, at 2:05 p.m. Although the time for filing a Rule 59 motion expired on June 1, 2000, neither the court nor the parties raised this issue or objected.

Mother did not specifically indicate the relief sought under each rule; however, as best as can be ascertained, Mother requested a new trial pursuant to HFCR Rule 59(a), *see*

5. *See infra* discussion Part VIII.

*infra* at 21, reconsideration of the May 22, 2000 order and the paternity judgment pursuant to HFCR Rule 59(e), and relief from or reconsideration of the custody provisions of both orders, apparently pursuant to HFCR Rule 60(b), *see infra* note 10.

Mother argued that (1) there was good cause for a new trial, because Mother "did not have the opportunity to present, and the Court did not have the opportunity to hear, significant probative evidence from witnesses who had direct personal knowledge of [Father]'s abusive personality"; and (2) the default judgment of June 23, 1999 should be set aside under Rule 60, because the relief granted did not conform to the paternity petition or to the service by publication, and, thus, Mother's due process rights were violated. Father maintained that (1) the burden was on Mother to show, not only good cause, but also "a material change in circumstances ... since the last Court order to justify re-opening the issue of custody or visitation"; [5] (2) the court had heard "copious evidence" at trial about Father's parenting skills and Mother's "deliberately and vindictively" taking Child out of the jurisdiction to keep Child away from Father; and (3) both parties had ample opportunity to present their cases at trial, and Mother had simply misallocated her time.

A hearing was held on the motion on June 14, 2000, at which the same judge presided as had presided at the trial. Regarding Rule 59(a), Mother argued that the proceedings should be reopened to receive the testimony by four witnesses who had not testified because time had run out at trial regarding potential abusive behavior by Father:

[S]ince the purpose [of the hearing] was sole custody over here and attack on the grounds of abuse and there were four people sitting out there to testify and they never got to say word one, we're asking the Court regardless of where we want to lay the responsibility for those people not coming in here, *we're asking the Court to reopen the proceedings so that those four people can testify and so that the best interests of the child, which is the only*

*thing we really should be concerned about, not the mother and the father, can be fully taken into account.*

I believe as to the [definition of "family violence" under Hawai'i Revised Statutes (HRS) § 571–46,] that if these four witnesses were allowed to testify, they [would] establish ample grounds for family violence[.]

(Emphasis added.)

Regarding relief from the default judgment under Rule 60(b), Mother argued that the default judgment obtained by Father created "a presumption that [Mother] has acted in some sort of bad faith or is guilty of some sort of malfeasance" and that "[Father] is not entitled to any presumption of his having sole custody as a result of the default judgment unless [he] can first prove that [Mother] is in sufficient bad faith and such a flight risk that restrictions on her access to the [C]hild should be put in place." Mother concluded by requesting relief under both Rules 59 and 60:

I guess the bottom line is . . . that the best interest of the child . . . almost requires that these other people who have relevant testimony . . . be given an opportunity to testify. And that's what we are asking for, whether it be under a motion to reconsider the entire situation, motion for new trial in which the Court has wide discretion for good cause shown to get us one, or a motion to provide relief from the existing May 22nd findings of fact, conclusions of law, and decision under Rule 60.

Father asserted that, inasmuch as the prior proceedings had produced the correct result, the court should not grant Mother's motion, and stated that "the threshold showing to reopen or to either reconsider or for new trial is good cause." Throughout the hearing, however, Father repeatedly declared that there had not been a "material

change in circumstances" which would warrant the granting of Mother's motions.[6] As to the "material change of circumstances" standard, Mother maintained that "[t]he issue here isn't whether there's been a material change in circumstances. The issue here is whether or not the circumstances that existed with respect to the original order . . . can be revisited. The issue of change in circumstances is not the standard."

In an oral ruling, after determining that reconsideration was not appropriate because there was nothing in the record that would warrant reconsideration, the court addressed the issue of a new trial:[7]

*[W]ith regard to the issue . . . of a new trial, the rule gives the ground for which the Court may grant . . . a new trial. And it lists it in Rule 60, B mistake and inadvertent surprise, excusable neglect, newly discovered evidence, fraud. None of those grounds exist in this case.*

There was a hearing. The claim is that [Mother] did not put on the witnesses that she wanted to put on. But from the very beginning when this matter was sent to this—this court for trial, the parties were informed that they had an hour-and-a-half each. And that hour-and-a-half was spend [sic] by [Mother] in this case, both in the presentation of its case, or her case, and also, the cross-examination of—of witnesses. And the parties each had over [an] hour and thirty minutes to present their case, and this did not include closing arguments which the Court permitted by way of written arguments after it closed hearing evidence in the case. Okay.

(Emphases added.)

In addressing the issue of notice and the presumption Mother alleged was created by the default judgment, the court indicated, "I'm not sure what [the court that granted

---

6. "Your Honor, there's absolutely no material change in circumstances to reopen this case whatsoever." "[T]here is no material change in circumstances whatsoever, Your Honor, to even think about reopening this or even thinking about having a GAL appointed."

7. Although the original hearing on May 1, 2000 pertained to Mother's and Father's motions, it functioned as a "trial," inasmuch as a trial en-

compasses hearings on the merits of custody determinations. *See Black's Law Dictionary* 1504 (6th ed.1990) (defining "trial" as "[a] judicial examination and determination of issues between parties to action, whether they be issues of law or of fact, before a court that has jurisdiction"). Thus, Mother's Rule 59 motion requested a "new trial."

the default judgment] took into consideration when [it] issued that sole custody [order]. He could have looked at the issue ... that the child had been ... taken out of the jurisdiction in derogation of the father's rights, and on that basis granted sole physical and legal custody ... to the father. And I think if that was the case, then he was in his right to ... make that decision." Thus, on June 14, 2000, the court denied the motion.

On July 12, 2000, Mother filed her appeal.

## IV.

■ We review a court's ruling upon a motion for new trial for an abuse of discretion. *See Shanghai Inv. Co., Inc. v. Alteka Co., Ltd.,* 92 Hawai'i 482, 491, 993 P.2d 516, 525 (2000) ("Both the grant and the denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion." (Citations omitted.)), *overruled in part on other grounds by Blair v. Ing,* 96 Hawai'i 327, 332, 31 P.3d 184, 188 (2001). The family court may grant a motion for a new trial "to all or any of the parties and on all or part of the issues for good cause shown[.]" HFCR Rule 59(a). We also review motions for reconsideration for an abuse of discretion. *See Gossinger v. Association of Apartment Owners of Regency of Ala Wai,* 73 Haw. 412, 425, 835 P.2d 627, 634 (1992) ("The applicable standard of review [of a motion for reconsideration] is abuse of discretion." (Citations omitted.)); *see also In re Jane Doe, Born on June 20, 1995,* 95 Hawai'i 183, 189, 20 P.3d 616, 622 (2001). When a court's decision has "clearly exceeded the bounds of reason" or has "disregarded rules or principles of law or practice to the substantial detriment of a party litigant[,]" the family court abuses its discretion. *Id.* at 189–90, 20 P.3d at 622–23 (citations and internal quotation marks omitted); *see also State v. Sacoco,* 45 Haw. 288, 292, 367 P.2d 11, 13 (1961).

Because Mother does not challenge any of the court's findings of fact as clearly erroneous, the findings of fact are binding on appeal. *See Puckett v. Puckett,* 94 Hawai'i 471, 484, 16 P.3d 876, 889 (App.2000) (explaining that, where husband failed to challenge any of family court's findings of fact, he was "bound by such findings and any conclusions of law that follow from such findings" on appeal (citation omitted)).

## V.

■ As a threshold matter, we consider whether Mother's Rule 59 motion was untimely filed, and, therefore, whether the family court lacked jurisdiction to grant it. A motion for a new trial, including taking of additional testimony, under HFCR Rule 59(a) and for reconsideration under Rule 59(e) must be made within ten days of entry of the judgment or order. HFCR Rule 59(b) states that "[a] motion for a new trial shall be filed not later than 10 days after the entry of the judgment unless otherwise provided by statute." HFCR Rule 59(e) similarly provides that, "[e]xcept as otherwise provided by HRS section 571–54, a motion to reconsider, alter or amend the judgment or order shall be filed not later than 10 days after entry of the judgment or order."

HFCR 6(a) (2000) explains that

[i]n computing any period of time prescribed or allowed by these rules, by order of court, or by any applicable statute, the day of the act, event, or default after which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included unless it is a Saturday, a Sunday or a holiday, in which event the period runs until the end of the next day which is not a Saturday, a Sunday or a holiday. *When the period of time prescribed or allowed is less than 7 days, intermediate Saturdays, Sundays and holidays shall be excluded in the computation.*

(Emphasis added.) The findings of fact, conclusions of law, and order in the present case were filed on May 22, 2000, which was a Monday. The period within which to file a Rule 59 motion, accordingly, expired on Thursday, June 1, 2000. Thus, Mother was required to file her Rule 59 motion by June 1, 2000. On that date, it was submitted to and "RECEIVED" by a circuit court clerk assigned to the family court. It was

"FILED" in the First Circuit Court on June 2, 2000.

HFCR Rule 5(e) (2000) defines the term "filing with the court." It provides that

> [t]he filing of pleadings and other papers with the court as required by these rules shall be made by filing them with the clerk of the court, except that the judge may permit the papers to be filed with the judge, in which event the judge shall note thereon the filing date and forthwith transmit them to the office of the clerk. Any other rule to the contrary notwithstanding, the clerk shall not refuse to accept for filing any paper presented for that purpose solely because it is not presented in proper form as required by these rules.

(Emphasis added.) HRS § 606-1 (1993) states that "[t]here shall be as many clerks of the circuit courts as may be necessary, appointed and removable by the judge or administrative judge thereof, as the case may be[,]" and "[t]he respective clerks of the supreme court, intermediate appellate court, circuit courts, and district courts *shall be ex officio clerks of all the courts of records*, and as such may issue process returnable in all such courts." (Emphasis added.) As such, Mother's submission of her motion to a circuit court clerk on June 1, 2000, and the clerk's acceptance and date stamping of it as "RECEIVED," was a filing that satisfied the jurisdictional requirements of HFCR Rule 59(a) and (e). Accordingly, the family court had jurisdiction to grant Mother's Rule 59 motion.[8]

## VI.

On appeal, Mother first argues that, in refusing to take further testimony concerning the alleged abusive behavior of Father, the court failed to consider the best interests of Child and, thus, abused its discretion in denying her motion for new trial and/or for reconsideration under HFCR Rules 59 and 60(b). She maintains that she

> called the [family] court's attention to the fact that Ms. Barnes and three other witnesses had been outside the courtroom waiting to testify at the time the trial ended and provided the trial court with affidavits from each witness showing that each witness would have testified as to [Father's] abusive conduct and fitness to be the custodial parent of [Child].

Mother indicated that two of the four witnesses had come from the mainland and Canada, and had attached to her motion the affidavits of the witnesses describing their proposed testimony.[9] Mother urges that the

---

8. We observe that Mother's motion was brought pursuant to both Rules 59 and 60(b). Accordingly, even if the trial court had lacked jurisdiction to grant Mother's Rule 59 motion, the court still retained jurisdiction to hear Mother's Rule 60(b) motion. HFCR Rule 60(b) requires that a motion under this rule be made "within a reasonable time, and for [mistake, inadvertence, surprise, or excusable neglect, newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b), and fraud,] not more than one year after the judgment, order, or proceedings was entered or taken."

9. Mother stated that her friend, Kim Barnes, would testify that Father is not a fit parent for Child and that he was verbally abusive to Mother and stalked her (Barnes) and harassed her in April of 1999. In her affidavit, Barnes stated, *inter alia,* that

   > [Mother] came to stay with us on October 18, 1998[.][S]he had no money at the time because [Father] had taken the house on the beach [and] all the furniture in it, ... [Mother] and her daughter [were] homeless without a penny. [Mother] could not re-enter the home to retrieve personal belongings or even a change of

clothes for her daughter because [Father] had set the alarm on the house and changed the code and padlocked the gates.... On more than one occasion I personally witnessed [Father] verbally abusing [Mother,] swearing and yelling, once in front of my two children.

In her memorandum in support of the motion, Mother stated that Mele Poleo, Child's former nanny, would have testified that "[Father] is not a fit parent" and that Child would be at risk of "serious physical and psychological harm if placed in [Father's] sole care." She would apparently also have testified about "[Father's] verbal and physical abuse: yelling, swearing, uncontrolled temper, veiled threats, physically throwing objects at people, and tormenting the dog." Poleo stated, *inter alia,* in her affidavit:

   > [Father] is very abusive in verbal and also physical [ways]. I've seen him yelling at [Mother] at the store in front of everybody else. A lot of times at the house when they talk[ed] and when he [didn't] get his way[ ] he raised his voice and a lot of times it seemed [Mother] and [Child] cried.... I am [in] fear of my life and even [Mother's] and [Child]'s life.... I['m] never comfortable leaving [Child] alone with him ... he'll scream at her and won't change her diapers.... Also [because of] his anger and

testimony of her witnesses bore on determining the best interests of Child and, therefore, should supersede the court's three-hour time limit ruling:

> Family Court Rule 59(a) provides the trial court with authority to take additional testimony if appropriate, upon good cause shown. However, the trial court refused to take this additional evidence, based solely on the fact that its announced three[-]hour time limit had expired. Certainly, the trial court must be given some deference in its ability to regulate its calendar and place reasonable time limits on trials and hearings. However, the court's administrative interest in enforcing the limits on trials should not supersede the court's obligation to consider relevant evidence to determine the best interests of the child in a custody hearing.

(Emphasis added.)

On the other hand, Father asserts that Mother's trial attorney (1) knew the court had scheduled the case for a one-half day hearing and did not object, (2) was allotted an equal amount of time to question witnesses and that "[Father]'s counsel used approximately 52% of the time and [Mother]'s counsel used 48%," (3) did not object when the court indicated that time was up, (4) did not ask that additional time be scheduled so

> tempere [sic] I'm sure it's not safe for [Child] as well as [Mother].... He [doesn't] watch his language ... and [Child] started talking and pick[ed] up words very fast. [Father] gets mad very fast at little things and yells at [Child,] "Gimme the remote" or "Get out of my way[,]" and ... he thinks it's funny when [Child] hurts other kids.

> Kathy Kerhoulas is a friend of Mother who, according to Mother, would testify that Father is not fit to have custody of his daughter because he exhibited "extreme aggressive, abusive behavior." Her affidavit describes verbal and physical abuse to his dog, verbal abuse to everyone he was close to, and extreme shifts in temper. Kerhoulas also stated that, using a knife, Father slit a new dress that she bought and smashed her alarm clock because she was Mother's friend. She stated that "[Mother] and [Child] could be in serious danger both physically and mentally."

> Kaulana T. Watanabe lived with Mother and Father in 1996 for three months. She worked at Mother's store and stated that Father's "anger problem" was one of the reasons that she moved out of their house and quit her job at the store. She stated:

that other witnesses could be called, (5) did not ask to make an offer of proof of Barnes' anticipated testimony, and (6) did not argue that it was an abuse of discretion or a violation of Mother's due process rights to preclude more witnesses.

## VII.

We observe that the grounds for relief under Rules 59 and 60 differ. Rule 59(a) states generally that relief may be extended "for good cause":

> (a) Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues for good cause shown. On a motion for a new trial, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

(Emphases added.) On the other hand, Rule 60(b) lists specific grounds for relief. These include: (1) mistakes, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud, misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; and (6) any other reason justifying relief from the operation of the judgment.[10]

> [Father] could not control himself if he could not get his way.... [Father] would throw thing[s] across the room and slam[ ] doors in the house or at the wedding store.... The few months I knew [Father] were the low points of my life.

10. HFCR Rule 60(b) provides in relevant part:

> (b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from any or all of the provisions of a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer

The court, however, misapprehended the "good cause" standard expressly set forth in Rule 59(a), referring instead to the grounds listed in Rule 60(b). *See supra* at —— ——, 44 P.3d at 1089. Although Mother sought relief under both Rules 59 and 60 in her motion, and argued both at the hearing on her motion, Mother's requested relief for reopening of the hearing to receive additional evidence should have been evaluated under the "good cause" standard of Rule 59(a).

## VIII.

At this point, it is helpful to address the applicability of the "material change in circumstances" standard in this case. Because Father argued that this standard was applicable in his memorandum in opposition to Mother's motion, ("The burden is also on [Mother] to show a material change in circumstances, such that it is in the best interests of the child, since the last Court order to justify re-opening the issue of custody or visitation."), and during the June 14, 2000 hearing regarding Mother's motion, *see supra* note 6, he apparently believed that the "material change in circumstances" justification was required in order for the court to grant Mother's motion.

Although this requirement is not expressly articulated in the statutes, several cases of the Intermediate Court of Appeals (ICA) have indicated that a parent seeking a change in his or her child's custody status must demonstrate that there has been a material change in the child's circumstances that warrant *amendment* of the original custody decision. *See In re Guardianship of Doe,* 93 Hawai'i 374, 388, 4 P.3d 508, 522 (App.2000) ("A person seeking a change in visitation must show a material change in circumstances since the previous visitation order." (Citation omitted.)); *Nadeau v. Nadeau,* 10 Haw.App. 111, 121, 861 P.2d 754, 759 (1993) (explaining that a parent requesting a change in custody must show a change in circumstances since the entry of the prior custody order); *see also Turoff v. Turoff,* 56

Haw. 51, 55 56, 527 P.2d 1275, 1278 (1974) (determining that, where a parent requests a change in custody, the "question is whether substantial change has occurred since the initial Decision and Order requiring modification or change in the award of custody of the minor child").

■ These cases, however, are inapposite because the parties were requesting a modification in custody and were not challenging the original custody determination in the context of a post-hearing motion, as was Mother. *See, e.g., In re Guardianship of Doe,* 93 Hawai'i at 376–78, 4 P.3d at 510–12 (Mother seeking a modification of guardianship two years after guardianship order entered, to which she had originally consented); *Nadeau,* 10 Haw.App. at 113–14, 861 P.2d at 756 (Father seeking joint legal custody and a modification of visitation two years after the divorce decree granting Mother legal and physical custody was final). Thus, the May 22, 2000 order was still subject to post-hearing motions and, therefore, was not an "amendment" of the original order, but, rather, part of the original custody proceedings.

## IX.

In reviewing the court's denial of Mother's Rule 59 motion, we must determine whether there was "good cause shown," HFCR 59, for granting Mother's motion. Hawai'i appellate courts have considered the scope of the term "good cause" in a variety of contexts. For example, in *Enos v. Pacific Transfer & Warehouse,* 80 Hawai'i 345, 910 P.2d 116, *reconsideration denied,* 81 Hawai'i 400, 917 P.2d 727 (1996), this court construed the term "good cause" in relation to Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(a)(5), which, prior to amendment, governed extensions of time for filing a notice of appeal "upon a showing of excusable neglect or good cause[.]" "Excusable neglect" was distinguished from "good cause" on the basis that the former related to those situations within the movant's control and the latter to those beyond the movant's control. *See id.* at 352,

equitable that the judgment should have prospective application; or (6) any other reason justify-

ing relief from the operation of the judgment.

910 P.2d at 123 ("[T]he trial court must first determine the cause of the delay in filing the notice of appeal. If that cause is beyond the movant's control, the motion may be granted upon a showing of 'good cause'"; however, "[i]f the cause of the delay is some mistake or inadvertence within the control of the movant, the motion may be granted only upon a showing of 'excusable neglect.'").

For purposes of HRS § 286–259(j) (1993), which governs continuances in Administrative Driver's License Revocation Office (ADLRO) hearings, the ICA, in *Miller v. Tanaka*, 80 Hawai'i 358, 910 P.2d 129, *reconsideration granted*, 80 Hawai'i 358, 910 P.2d 129, *reconsideration denied*, 80 Hawai'i 358, 910 P.2d 129 (App.1995), *cert. denied*, 80 Hawai'i 357, 910 P.2d 128 (1996), *superseded by statute on other grounds as stated by Gray v. Administrative Dir. of the Court*, 84 Hawai'i 138, 931 P.2d 580 (1997), explained that

> [t]he term "good cause" has been defined to mean "a substantial reason amounting in law to a legal excuse for failing to perform an act required by law." *Black's Law Dictionary* [at 692]. "Good cause" also "depends upon the circumstances of the individual case, and a finding of its existence lies largely in the discretion of the officer or court to which [the] decision is committed." *Id.*
>
> This definition comports with Hawai'i cases interpreting the term "good cause."
>
> *As a general rule, "good cause" means a substantial reason; one that affords a legal excuse....*
>
> *State v. Estencion*, 63 Haw. 264, 267, 625 P.2d 1040, 1042–43 (1981) (citations omitted) (emphasis added). *See also Noor v. Agsalud*, 2 Haw.App. 560, 563, 634 P.2d 1058, 1060 (1981) (in an employment context, relevant statute defining "leaving of work" for "good cause where it is for a real, substantial or compelling reason[,]" provided a "common sense construction of the term 'good cause'").

*Id.* at 363–64, 910 P.2d at 134–35 (brackets omitted).

Thus, "['good cause'] is a relative and highly abstract term, and its meaning must be determined not only by verbal context of [the] statute in which [the] term is employed[,] but also by context of action and procedures involved in [the] type of case presented." *Black's Law Dictionary* at 692. With this in mind, we examine Mother's first point.

## X.

### A.

In conjunction with her first point, Mother argues that "once the trial court became aware ... at the original hearing ... that relevant evidence concerning abuse had been excluded as a result of the trial court's three-hour time limit, it was an abuse of discretion for the trial court to refuse to receive such evidence." But because Mother did not object at trial, "the trial court [did not] bec[o]me aware" of the omission during trial. In the absence of such an objection at trial there cannot be error, absent plain error. *See Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 379 n. 29, 944 P.2d 1279, 1322 n. 29 (1997). Accordingly, if counsel believe that relevant evidence must be heard after the time set for the hearing has expired, they must move for an extension of time. Mother does not claim plain error.

### B.

We have said that

> "[the] family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion." *In re Jane Doe, Born on May 22, 1976*, 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996). Thus, we will not disturb the family court's decision on appeal "unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant ... and its decision clearly exceeded the bounds of reason." [*Id.*]

*In re Jane Doe*, 95 Hawai'i at 189–90, 20 P.3d at 622–23 (some citations and brackets omitted). Accordingly, we acknowledge that the court had the authority to set a reasonable time limit for trials and hearings. "[C]ourts have inherent equity, supervisory, and administrative powers as well as inherent pow-

er to control the litigation process before them." *Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 507, 880 P.2d 169, 182 (1994). Trial courts maintain discretion over various aspects of the proceedings before them. *See, e.g., State v. Okumura,* 78 Hawai'i 383, 399, 894 P.2d 80, 96 (1995) ("[T]he scope of cross-examination at trial are matters exercised within the discretion of the trial court[.]" (Citation omitted.)); *State v. Valmoja,* 56 Haw. 452, 454, 540 P.2d 63, 64–65 (1975) (it is within a trial court's discretion to determine whether "to apply the . . . usual rule that the party who calls a witness may re-examine him [or her] to explain any cross-examination" (citation omitted)); *Crow v. Crow,* 49 Haw. 258, 263–64, 414 P.2d 82, 86 (1966) (it was not an abuse of discretion for the trial court to prohibit a party from calling corroborating witnesses in a motion to reopen where the court limited the hearing to "matters set forth in the affidavit supporting the motion to reopen" (internal quotation marks omitted)); *State v. Chow,* 77 Hawai'i 241, 251 n. 12, 883 P.2d 663, 673 n. 12 (App.1994) (sentencing court's time limitations on a defendant's right of allocution is reviewed, "[l]ike other court proceedings," in light of the court's "soundness of [ ] discretion"); *State v. Ahlo,* 2 Haw.App. 462, 470, 634 P.2d 421, 427 ("[I]t is obviously within the scope of the court's discretion to limit the amount by which counsel, during argument, may elaborate on [jury] instructions."), *cert. denied,* 456 U.S. 981, 102 S.Ct. 2252, 72 L.Ed.2d 858 (1982). Additionally, Hawai'i Rules of Evidence (HRE) [11] Rule 611 (1993) vests discretion in the trial court, to control the proceedings before it:

The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.[12]

However, when it denied the motion for new trial, the court indeed erred. Its ruling resulted in the exclusion of testimony of witnesses bearing upon the issue of family violence and, inferentially, the best interest of Child.

## XI.

### A.

■ A guiding principle for family courts in awarding custody under Hawai'i law is the best interests of the child. HRS § 571–46 (Supp.1999) states in pertinent part:

**Criteria and procedure in awarding custody and visitation.** In the actions for divorce, separation, annulment, separate maintenance, *or any other proceeding where there is at issue a dispute as to the custody of a minor child, the court,* during the pendency of the action, at the final hearing, *or any time during the minority of the child, may make an order for the custody of the minor child as may seem necessary or proper.* In awarding the custody, the court shall be guided by the following standards, considerations, and procedures:

(1) Custody should be awarded to either parent or to both parents according to *the best interests of the child* [.]

(Boldfaced type in original.) (Emphases added.) Under HRS § 571–46, "[c]ustody should be awarded to either parent or to

---

11. The HRE apply in family court. HRE Rule 1101 (1993) states that "[t]hese rules apply to all courts of the State of Hawai'i except as otherwise provided by statute."

12. This discretion is not unlimited, however, and must be balanced against the rights of the parties to present their cases on the merits. The Commentary to Federal Rules of Evidence Rule 611, which is substantially similar to HRE Rule 611, also emphasizes this balancing of interests:

Rule 611(a) restates the traditional role of the Judge, which is to exercise reasonable control over the manner in which proceedings are conducted in order to ensure that witnesses and parties are fairly treated and that the search for truth is not impaired by presentation of prejudicial, confusing, or extraneous material.

The discretion of the trial judge in controlling the proceedings are also limited by other considerations. *See, e.g., United States v. Jones,* 982 F.2d 380, 383–85 (9th Cir.1992) (reversing a conviction because the trial judge's absolute ban on recross examination, even when new matter was brought out on redirect, violated the defendant's confrontation rights).

both parents according to the best interests of the child." Thus, in custody proceedings, "the paramount consideration ... is the best interests of the child." *In re Doe,* 52 Haw. 448, 453, 478 P.2d 844, 847 (1970). *See also Fujikane v. Fujikane,* 61 Haw. 352, 354, 604 P.2d 43, 45 (1979) ("The critical question to be resolved in any custody proceeding is what action will be in the best interests of the child." (Citation omitted.)); *Yee v. Yee,* 48 Haw. 439, 441, 404 P.2d 370, 372 (1965) ("In any custody proceeding, the welfare of the minor children is of paramount consideration." (Citation omitted.)); *Dacoscos v. Dacoscos,* 38 Haw. 265 (1948) (stating that, in custody cases, the "general rule [is] that the welfare of the child has paramount consideration"); *In re Doe,* 7 Haw.App. 547, 556, 784 P.2d 873, 879 (1989) ("Under HRS § 571–46, the determining factor with respect to child custody is the best interests of the child." (Citation omitted.)).

A determination of family violence bears directly upon the best interests of the child, as indicated in HRS § 571–46(9), which provides that, when a determination of family violence is made by the family court, a rebuttable presumption is created that custody should not be placed with the perpetrator:

> In every proceeding where there is at issue a dispute as to the custody of a child, a determination by the court that family violence has been committed by a parent raises a rebuttable presumption that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody, or joint physical custody with the perpetrator of family violence.

Father was allowed to testify and present all of his witnesses to the court. Mother testified, but the court did not hear from any of her other witnesses, in particular, those who would have testified, according to their affidavits, about Father's alleged abuse of Mother and its related effect on Child. Evidence supporting such allegations was pertinent to whether Father should have sole legal and physical custody of Child. *See* HRS § 571–46(9); *see also supra* note 9.

**B.**

Whereas the best interests of Child are paramount, *see* discussion *supra,* the testimony of Mother's witnesses would have been helpful to resolve the underlying issue of domestic violence raised by Mother. According to their affidavits, such testimony was relevant and material to the court's custody determination. Inasmuch as (1) there were allegations of domestic violence by Mother, (2) it was found that "[t]he evidence presented [as to that issue] is inconclusive[,]" and (3) the testimony by Mother's other witnesses bore on the best interests of Child, we believe that Mother demonstrated a "substantial reason," *i.e.,* good cause for granting Mother's Rule 59(a) motion with respect to reopening the hearing. We caution the family courts that adherence to a time schedule must be tempered by the circumstances of the proceeding as it unfolds, since such circumstances cannot always be accurately predicted ahead of time.[13]

**XII.**

In light of the foregoing, we believe the court "disregarded rules or principles of law or practice to the substantial detriment of a party litigant[,] ... and its decision [to deny the Rule 59 motion] clearly exceeded the bounds of reason." *In re Jane Doe,* 95 Hawai'i at 189–90, 20 P.3d at 622–23 (some citations and brackets omitted). As mentioned, there was good cause shown for the court to grant Mother's Rule 59 motion. Moreover, the court apparently limited its post-trial determination to "mistake and inadvertent surprise, excusable neglect, newly discovered evidence, [and] fraud[.]" It did not apply the "good cause" standard set forth in Rule 59(a), thereby "disregard[ing] rules or principles of law[.]" *In re Jane Doe,* 95 Hawai'i at 189–90, 20 P.3d at 622–23 (some citations and brackets omitted). Thus, we must conclude the court abused its discretion in denying the motion for new trial insofar as it denied Mother's request for further proceedings on her alternative motion for custody.

---

**13.** We do not doubt the court acted in good faith in this case.

## XIII.

Second, Mother argues that the trial court abused its discretion when, on May 22, 2000, it denied the motion to set aside the paternity judgment of June 23, 1999. Mother seeks to set aside the judgment on the grounds that "(1) [Father] misrepresented to the court that [Mother] had left the jurisdiction after the filing of the paternity petition; and (2) [Father] sought and obtained full custody by default when he had prayed only for joint custody." Mother maintains that Father's seeking "greater or substantially different relief than the relief upon which default" was entered "violates due process, because [Mother] was not provided with notice (actual or constructive) that [Father] would be seeking relief different from what was requested in the paternity petition." She declares that "the trial court's refusal to reopen the custody proceeding [resulted in] a decided procedural disadvantage at the hearing of this matter, because she was faced with the burden of overturning an existing custody order that had been taken against her by default."

With respect to the first ground, the court found in relevant part in its findings of fact that, on December 25, 1998, Mother left with Child for a two-month visit with her brother in Texas, and that, on January 6, 1999, Father filed his paternity petition. Contrary to Mother's contentions, the transcript of the default hearing on the paternity judgment indicates that Father's counsel did accurately inform the court that Mother left in December 1998, prior to the filing date of the petition.[14] Thus, there is no merit to this argument.

█ As to Mother's second contention, Father concedes that the original paternity petition, filed on January 6, 1999, did request joint legal and physical custody of the minor child. However, Father accurately points out that the publication notice, published in the Honolulu Advertiser once a week for four consecutive weeks from March 26, 1999 through April 16, 1999, did state that "[Father] should be awarded *sole* legal and physical custody of the parties' child, subject to [Mother]'s rights of reasonable visitation." (Emphasis added.) The court is not limited to making a decision according to the formal pleadings of the parties. *See, e.g., Maeda v. Maeda,* 8 Haw.App. 139, 142, 794 P.2d 268, 270 (trial court's order granting mother custody of son conditioned upon her remaining in Hawai'i upheld, despite fact that neither party sought such order), *cert. denied,* 71 Haw. 668, 833 P.2d 900 (1990). Under these circumstances, we do not believe that, on the grounds set forth by Mother, the court abused its discretion in denying the motion to set aside the default judgment.

As to Mother's argument that "the trial court's refusal to set aside the default paternity petition" presented Mother "with the burden of overturning an existing custody order that had been taken against her by default[,]" we note that the hearing before the court was a proceeding to resolve just this issue—whether Mother's motion to set aside the default judgment should be granted.

The court's findings of fact and conclusions of law address the paternity issue of the default judgment, concluding that, "[b]ased upon [Mother]'s admission, there is clear and convincing evidence to support the default judgment herein that [Father] is the father of [Child]." As to the issue of custody, the trial court's findings do not indicate that a presumption against Mother's custody of Child was made by virtue of the default judgment. The court apparently applied the "best interests of the child" standard to custody, concluding that "it is in the best interest of [Child] to have the benefit of both parents involved in her upbringing and development. The court concludes that [Father]

14. The following exchange took place at the hearing:

[FATHER]: Yeah, I haven't seen the baby since Christmas.

THE COURT: Yeah, Court's going to reserve the current support. I got no idea what she makes, and it's a situation by which father should have custody; and I will make a finding that the mother has left the jurisdiction. I understand she left the jurisdiction after the filing of the petition?

[FATHER'S COUNSEL]: *She left in December, 1998, Your Honor, immediately before* or—

[FATHER]: *December of '98, day after Christmas, around there.*

(Emphases added.)

will best provide a stable home in Hawai'i for [Child] where [Child] can be assured a relationship with both parents." Thus, the court's conclusions of law do not reflect any presumption, and we see no basis for inferring one.[15]

On remand, then, Mother will be able to present her excluded witnesses and further argument with respect to the custody status of Child.

## XIV.

Therefore, (1) the court's denial of Mother's motion to set aside the June 23, 1999 default judgment is affirmed, (2) its May 22, 2000 findings of fact, conclusions of law, and order, as they pertain to issues regarding Mother's alternative motion to award custody of Child to her are vacated, except as to those provisions awarding Mother reasonable visitation rights, (3) its June 24, 2000 order denying new trial is vacated, and (4) the case is remanded for further proceedings on Mother's alternative custody motion.

**15.** We note that, as custody orders may be modified pursuant to HRS § 571–46, custody orders are subject to modification at *any time* during the minority of the child, and, thus, the default judgment awarding sole legal custody to Father may be modified at any time based on Child's best interest. *See* HRS § 571–50 ("[A]ny decree or order of the [family] court may be modified at any time."); *see also* HRS § 571–46(6) (1993 & Supp.2001) ("Any custody award shall be subject to modification or change *whenever* the best interests of the child require or justify the modification or change[.]" (Brackets omitted.) (Emphasis added.)); *In re Guardianship of Doe*, 93 Hawai'i at 381, 4 P.3d at 517 ("[A]ny custody award is 'subject to` modification or change *whenever* the best interest of the child requires[.]'" (Some internal citations omitted.) (Emphasis added.) (Quoting HRS § 571–46(6).)); *Fujikane*, 61 Haw. at 354, 604 P.2d at 44–45; *Turoff*, 56 Haw. at 55, 527 P.2d at 1278; *Camerlingo v. Camerlingo*, 88 Hawai'i 68, 76, 961 P.2d 1162, 1170 (App.1998).